## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF VIRGINIA
## BIG STONE GAP DIVISION

| | | |
|---|---|---|
| **RHONDA G. AMAYA,** | ) | |
| Plaintiff | ) | |
| v. | ) | Civil Action No. 2:13cv00020 |
| | ) | **MEMORANDUM OPINION** |
| | ) | |
| **CAROLYN W. COLVIN,** | ) | |
| **Acting Commissioner of** | ) | |
| **Social Security,** | ) | By:   PAMELA MEADE SARGENT |
| Defendant | ) | United States Magistrate Judge |

*I. Background and Standard of Review*

Plaintiff, Rhonda G. Amaya, ("Amaya"), filed this action challenging the final decision of the Commissioner of Social Security, ("Commissioner"), denying plaintiff's claims for disability insurance benefits, ("DIB"), and supplemental security income, ("SSI"), under the Social Security Act, as amended, ("Act"), 42 U.S.C.A. §§ 423 and 1381 *et seq.* (West 2011 & West 2012). Jurisdiction of this court is pursuant to 42 U.S.C. §§ 405(g) and 1383(c)(3). This case is before the undersigned magistrate judge by transfer based on consent of the parties pursuant to 28 U.S.C. § 636(c)(1). Oral argument has not been requested; therefore, the matter is ripe for decision.

The court's review in this case is limited to determining if the factual findings of the Commissioner are supported by substantial evidence and were reached through application of the correct legal standards. *See Coffman v. Bowen*, 829 F.2d 514, 517 (4th Cir. 1987). Substantial evidence has been defined as "evidence which a reasoning mind would accept as sufficient to support a particular conclusion. It consists of more than a mere scintilla of evidence but may

-1-

be somewhat less than a preponderance." *Laws v. Celebrezze,* 368 F.2d 640, 642 (4th Cir. 1966). "'If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there is "substantial evidence."'" *Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990) (quoting *Laws*, 368 F.2d at 642).

The record shows that Amaya protectively filed her applications for SSI and DIB on March 16, 2009, alleging disability as of May 15, 2007,[1] due to bipolar disorder, anxiety, depression, socio-phobia, heart problems and high blood pressure. (Record ("R."), at 203-08, 232, 245.) The claims were denied initially and upon reconsideration. (R. at 126-31, 133-34, 138-45.) Amaya then requested a hearing before an administrative law judge, ("ALJ"). (R. at 146.) A hearing was held on Amaya's claims on November 16, 2011. (R. at 29-71.) Amaya was represented by counsel at this hearing. (R. at 29.)

By decision dated December 15, 2011, the ALJ denied Amaya's claims. (R. at 14-26.) The ALJ found that Amaya met the disability insured status requirements of the Act for DIB purposes through June 30, 2010.[2] (R. at 16.) The ALJ found that Amaya had not engaged in substantial gainful activity since May 15, 2007, the alleged onset date. (R. at 16.) The ALJ found that the medical evidence established that Amaya had severe impairments, namely affective disorder (bipolar disorder and depression), anxiety disorder, history of drug abuse and obesity, but the ALJ found that Amaya did not have an impairment or combination of impairments that met or medically equaled one of the listed

---

[1] Although Amaya listed January 15, 2007, as her alleged onset date in her applications for DIB and SSI, she confirmed at her hearing that it was May 15, 2007, and this date also is reflected in her Disability Report. (R. at 36, 232, 245.)

[2] Therefore, Amaya must show that she became disabled between May 15, 2007, the alleged onset date, and June 30, 2010, the date last insured, in order to be entitled to DIB benefits.

impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1. (R. at 16, 18.) The ALJ found that Amaya had the residual functional capacity to perform light work[3] that did not require her to climb ladders, ropes or scaffolds, to be exposed to unprotected heights or more than occasionally climbing ramps or stairs, balancing, stooping, kneeling, crouching, crawling, operating foot controls or reaching. (R. at 20.) The ALJ found that Amaya was able to understand, remember and carry out simple instructions, to make judgments on simple work-related decisions, to interact appropriately with supervisors and co-workers in a routine work setting and to respond to usual work situations and to changes in a routine work setting. (R. at 20.) The ALJ also found that Amaya should be isolated from the public with only occasional supervision and occasional interaction with co-workers. (R. at 20.) The ALJ found that Amaya was unable to perform any of her past relevant work. (R. at 24.) Based on Amaya's age, education, work experience, residual functional capacity and the testimony of a vocational expert, the ALJ found that a significant number of jobs existed in the national economy that Amaya could perform, including jobs as merchandise marker, a machine tender and a checker. (R. at 24-25.) Thus, the ALJ concluded that Amaya was not under a disability as defined by the Act and was not eligible for DIB or SSI benefits. (R. at 25-26.) *See* 20 C.F.R. §§ 404.1520(g), 416.920(g) (2013).

After the ALJ issued his decision, Amaya pursued her administrative appeals, but the Appeals Council denied her request for review. (R. at 1-4, 10.) Amaya then filed this action seeking review of the ALJ's unfavorable decision, which now stands as the Commissioner's final decision. *See* 20 C.F.R. §§ 404.981, 416.1481 (2013). This case is before this court on Amaya's motion for summary

---

[3] Light work involves lifting items weighing up to 20 pounds at a time with frequent lifting or carrying of items weighing up to 10 pounds. If someone can perform light work, she also can perform sedentary work. *See* 20 C.F.R. §§ 404.1567(b), 416.967(b) (2013).

judgment filed December 23, 2013, and the Commissioner's motion for summary judgment filed January 17, 2014.

## II. Facts

Amaya was born in 1964, (R. at 520), which, at the time of the ALJ's decision, classified her as a "younger person" under 20 C.F.R. §§ 404.1563(c), 416.963(c). Amaya graduated from high school and attended two years of college. (R. at 505.) Amaya has past work experience as a licensed practical nurse. (R. at 505.) Amaya testified at her hearing that she quit work in 2007 because "being around the people was causing a lot of panic attacks…." (R. at 39.) Amaya also testified that she began having seizures around this period of time in which she would blackout, and others would say that her body would shake and that she would talk to people who were not there. (R. at 39-40.) Amaya stated that, after one of these seizures, she would be required to lie in bed for a couple of days because she would be sore and groggy. (R. at 40-41.) Amaya stated that these "episodes," as she called them, have come under control with medication. (R. at 42.) At the time of her hearing, Amaya claimed that she would have two to three episodes per week where she would simply stare until someone touched her. (R. at 42.)

Amaya testified that, as long as she stayed isolated at home, she could avoid having panic attacks, but she stated that she continued to experience crying spells a couple of times a week. (R. at 43.) Amaya also testified that she used illicit drugs only when she felt stress and panic that she could not otherwise get under control. (R. at 44.) Later in her testimony, however, Amaya stated that she had not used drugs recreationally since her children were born. (R. at 51.) Amaya testified that her children were then 19 and 25 years old. (R. at 52.)

-4-

Amaya also testified that she suffered from chronic headaches every day. (R. at 45.) She stated that, at least once a month, her head would hurt so badly that she was forced to go to bed. (R. at 45.) Amaya stated that she slept an average of two hours a night. (R. at 46.) As a result, she stated that she stayed tired. (R. at 46.) Amaya also testified that she previously had injured both of her feet when she stepped off a porch during a seizure. (R. at 47.) She stated that she had continuous pain that made it difficult to stand, walk and get out of bed. (R. at 47.) She stated that her feet and ankles would often swell during the day, which would require her to prop up her feet during the day. (R. at 47.)

Amaya testified that there were days when she did not want to get out of bed or groom herself. (R. at 48-49.) In fact, she testified that she had once stayed in her bedroom for two months straight, leaving only to use the bathroom and get something to drink. (R. at 49.) Amaya stated that her medication was helping her condition, but that she still had a couple of days a month when she did not want to get out of bed. (R. at 49.)

Mark Hileman, a vocational expert, also was present and testified at Amaya's hearing. (R. at 58-70.) He classified Amaya's past work as a children's institution attendant as medium,[4] semi-skilled work, as a licensed practical nurse as medium, skilled work and as a restaurant hostess as light, semi-skilled work. (R. at 61-62.) The ALJ asked Hileman to consider a hypothetical individual of Amaya's age, education and work experience, who could occasionally lift, carry and push or pull items weighing up to 50 pounds and frequently lift, carry and push or pull items weighing up to 25 pounds, stand and/or walk with normal breaks for a total

---

[4] Medium work involves lifting items weighing up to 50 pounds at a time with frequent lifting or carrying of items weighing up to 25 pounds. If an individual can do medium work, she also can do sedentary and light work. *See* 20 C.F.R. §§ 404.1567(c), 416.967(c) (2013).

of about six hours in an eight-hour workday, sit with normal breaks for a total of about six hours in an eight-hour workday, never climb ladders, ropes or scaffolds, could occasionally climb ramps and stairs, frequently balance, stoop, kneel, crouch and crawl and who should avoid all exposure to hazards such as dangerous moving machinery and unprotected heights. (R. at 62-63.) The ALJ also asked Hileman to assume that this individual could occasionally interact with the public, supervisors and her co-workers. (R. at 63.)

Hileman testified that a person with those restrictions could not perform Amaya's past work as a restaurant hostess, but could perform her past work as a children's institution attendant and as a licensed practical nurse. (R. at 63-64.) Hileman did testify that a significant number of jobs existed that such an individual could perform, including jobs as a laundry worker, a hand packager and a merchandise marker. (R. at 64.) Hileman testified that the laundry worker and hand packager jobs were classified as medium, unskilled work and that the merchandise maker job was classified as light, unskilled work. (R. at 64.)

The ALJ asked Hileman to assume the same individual as above, but who was restricted to occasionally lifting and carrying items weighing up to 20 pounds and frequently lifting and carrying item weighing up to 10 pounds, occasionally operating foot controls, with a sit/stand option, occasionally balancing, stooping, kneeling, crouching, crawling and reaching overhead. (R. at 65.) This individual would be able to understand, remember and carry out simple instructions, to make judgments on simple work-related decisions, to interact appropriately with supervisors and co-workers in a routine work setting and to respond to the usual work situations and changes in a work setting, but who would need to be isolated from the public with only occasional supervision and only occasional interaction with co-workers. (R. at 65-66.) Hileman stated that such an individual could not

-6-

perform any of Amaya's past work and that there would be no jobs available for such an individual. (R. at 67-68.) Hileman stated that, if the sit/stand option was removed, such an individual could perform work as a merchandise marker, a canning machine tender and a checker. (R. at 68-69.) Hileman also testified that if an individual would be absent from work more than three days a month, there would be no jobs available that the individual could perform. (R. at 69-70.)

In rendering his decision, the ALJ reviewed records from Dr. Christopher M. Basham, M.D.; Robert S. Spangler, Ed.D., a licensed psychologist; Dr. Noah Kolb, M.D., a neurologist; James Kegley, MS, and Joyce Thompson, FNP, with Wise County Behavioral Health; Dr. Jenell R. Decker, M.D., and Stacey B. Gipe, PA-C, with Medical Associates of Southwest Virginia; Lonesome Pine Hospital; Southwestern Virginia Mental Health Institute; Dr. Kevin Blackwell, D.O.; B. Wayne Lanthorn, Ph.D., a licensed clinical psychologist; Dr. Jo Ann Arey, M.D., with Blue Ridge Health Associates; Dr. Asim Rana, M.D., a psychiatrist with The Center for Behavioral Health; Twin County Regional Hospital; Joseph Leizer, Ph.D., a state agency psychologist; Dr. Michael Hartman, M.D., a state agency physician; Dr. Robert McGuffin, M.D., a state agency physician; and Richard J. Milan, Jr., Ph.D., a state agency psychologist.

Amaya treated with Dr. Jo Ann Arey, M.D., with Blue Ridge Health Associates, from Janaury 2006 to March 2008. (R. at 394-405, 408-28, 430-36, 438-44, 470-72.) Dr. Arey performed a new patient evaluation of Amaya on January 23, 2006. (R. at 394-96.) Amaya told Dr. Arey that she had a "nervous breakdown" when she was 30 years old and had been taking Prozac and Seroquel ever since. (R. at 394.) Amaya told her that she also had been given Xanax in the past, but that she had undergone drug rehabilitation to quit taking Xanax. (R. at 394.) Amaya said that she had suffered a mild heart attack when she was being

tapered off Xanax. (R. at 394.) Amaya complained of depression, insomnia, high blood pressure and occasional headaches. (R. at 394.) Dr. Arey's physical examination revealed nothing abnormal other than blood pressure readings of 138/90 and 156/90. (R. at 395.) She noted that Amaya was oriented with no signs of mood, thought or memory difficulty. (R. at 395.)

Amaya returned to see Dr. Arey on February 20, 2006, complaining of depression and years of daily headaches. (R. at 397.) Dr. Arey noted that Amaya's affect was tearful, congruent with her stated mood without signs of thought or memory difficulty. (R. at 398.) She denied any suicidal or homicidal ideations. (R. at 398.) Amaya said that she experienced headaches at least twice a month that required something stronger than over-the-counter medications. (R. at 397.) She stated that her previous physician had given her Vicodin. (R. at 397.) Amaya stated that she was having trouble finding a job and could no longer work as a nurse due to "stress." (R. at 397.) Dr. Arey gave Amaya a prescription for Ultram for her headaches and referred her for counseling. (R. at 397.)

On April 20, 2006, Dr. Arey instructed Amaya that she must be seen on a monthly basis to continue to receive refills of her prescriptions. (R. at 403.) On this occasion, Amaya continued to complain of high blood pressure, "nerves," and headaches. (R. at 403.) Amaya stated that she was taking up to 10 Tylenol a day for headaches, which she attributed to high blood pressure. (R. at 403.) Amaya stated that she drank three to four caffeinated beverages a day, but denied any use of alcohol or illegal drugs. (R. at 403.) Dr. Arey encouraged Amaya to stop taking the over-the-counter medication for her headaches due to rebound headaches and urged her to taper off caffeine. (R. at 403.) She also recommended a neurological evaluation. (R. at 403.) She wrote Amaya a prescription for Vicodin to use sparingly for only severe headaches. (R. at 403.) Amaya relayed experiencing

episodes of depression and said that she had a lot of anger related to her father and the way her life had turned out. (R. at 403.)

On July 19, 2006, Amaya told Dr. Arey that her "nerves" and depression were much better since taking a new job, getting out of the house and making new friends. (R. at 409.) She also stated that she had stopped consuming caffeine, and her headaches had improved. (R. at 409.) Dr. Arey also noted that Amaya's hypertension had improved with a blood pressure reading of 121/76. (R. at 409-10.) Dr. Arey did prescribe 15 Vicodin to use as needed for severe headaches. (R. at 410.)

On July 23, 2006, Amaya presented to the Twin County Regional Hospital emergency department seeking treatment for a headache. (R. at 344-52.) Amaya stated that she had run out of her Vicodin. (R. at 346, 348.) The emergency room physician gave Amaya another prescription for Vicodin. (R. at 347.) On August 15, 2006, Amaya presented to the emergency department with complaints of extremity pain due to lifting at work. (R. at 334-43.) The attending physician diagnosed left rotator cuff strain. (R. at 337.) She was given a Toradol shot and prescriptions for Ultracet and Orudis. (R. at 335, 342.)

On August 16, 2006, Dr. Arey saw Amaya for complaints of a sprain/strain of her left shoulder. (R. at 412.) Amaya stated that she had filled in as a dishwasher at her job, which had required lifting a large rack of glasses and dishes repetitively over her head. (R. at 412.)  Amaya said that she had received a Toradol shot the night before in the hospital emergency department, and it had helped. (R. at 412.) Dr. Arey noted mild soreness and pain upon movement in Amaya's shoulder, with normal strength and sensation in both arms. (R. at 413.) Dr. Arey prescribed Mobic for shoulder pain and told Amaya that she might use her Vicodin sparingly. (R. at

412.) Dr. Arey released Amaya to return to light-duty work pending her next doctor's appointment. (R. at 412.)

Amaya returned for follow-up on her shoulder injury on August 29, 2006. (R. at 414.) Amaya stated that she worked light-duty only one day before she was placed by her employer back in the dishwashing position, resulting in pain in both shoulders. (R. at 414.) Dr. Arey stated that Amaya should not work again until September 4, 2006. (R. at 414.) She gave Amaya a Toradol injection and told her to take Aleve and Vicodin sparingly for pain. (R. at 414.)

Amaya again sought treatment at the Twin County Regional Hospital emergency department on September 23, 2006, for complaints of being sore all over due to a motor vehicle accident. (R. at 322-32.) The attending physician diagnosed cervical strain. (R. at 325.) Amaya was given prescriptions for Flexeril and Naprosyn. (R. at 331.)

Amaya was upset when she returned to see Dr. Arey on September 28, 2006, explaining that she had been in three motor vehicle accidents, totaling all three vehicles, in a 24-hour period recently. (R. at 420.) Dr. Arey noted that Amaya was very anxious and tearful. (R. at 419.) Amaya stated that the first accident was the result of another driver pulling out in front of her vehicle. (R. at 420.) She stated that she experienced blackout spells during the other two accidents. (R. at 420.) Amaya stated that she suffered a cervical sprain with neck discomfort as a result of these accidents. (R. at 420.) Amaya denied taking excessive medication or running out of any of her medications prior to these blackouts. (R. at 420.) Although Amaya denied using any illegal drugs, she admitted that she would sometimes "get Percocet of the street" for her headaches. (R. at 420.) Dr. Arey stated that Amaya had suffered some "absence-type spells" in the past with no evidence of seizure

activity. (R. at 420.) Dr. Arey instructed Amaya not to drive and arranged an appointment with a neurologist. (R. at 419.) Dr. Arey also gave Amaya a prescription for Percocet. (R. at 420.)

Amaya returned on October 1, 2006, and saw Dr. Robert Pryor, M.D., complaining of pain all over and headache. (R. at 422.) Amaya claimed that she was taking Percocet every four hours for pain with only partial relief and that she could not sleep because of the pain. (R. at 422.) Dr. Pryor noted an abrasion on Amaya's left neck from a "seatbelt burn" and blisters on both feet. (R. at 422.) Amaya stated that the blisters on her feet were from where she "walked the streets for 3 days before I came to." (R. at 422.) Dr. Pryor stated that her complaints of myalgias were not unexpected after a significant motor vehicle accident, but he did note that Amaya had made numerous previous requests for narcotics in the past. (R. at 422.) Nonetheless, Dr. Pryor gave Amaya prescriptions for Percocet and Flexeril. (R. at 422.)

Amaya returned to the Twin County Regional Hospital on October 5, 2006, stating that she was out of her pain medication. (R. at 312-21.) Amaya requested a prescription for Percocet, but was discharged with a prescription for Ultram. (R. at 320.)

When Amaya returned to see Dr. Arey on December 12, 2006, she told Dr. Arey that she had not kept her referral to a neurologist because she had decided that her Seroquel prescription was the cause of her blackouts and that she had discontinued taking it. (R. at 426.) Amaya explained that about a month previous she had stopped taking all of her medications. (R. at 426.) After about a week, she decided that she needed to take her blood pressure medicine because her blood pressure was rising, and she was having headaches. (R. at 426.) Amaya said that

she went back on all of her medicine except for the Seroquel and that she increased her Klonopin dose from twice a day to three times a day without consulting any physician. (R. at 426.) Amaya stated that she had not experienced any feelings of "being outside her body" since stopping the Seroquel. (R. at 426.) Amaya stated that she was back at work part-time. (R. at 426.) Dr. Arey advised Amaya that it was dangerous to stop her medications without consulting a physician, and referred Amaya to a psychiatrist for adjustment of her medications for bipolar disorder. (R. at 426.) Dr. Arey again referred Amaya to a neurologist to evaluate her bouts of syncope. (R. at 426.)

Amaya returned to see Dr. Arey on January 23, 2007, stating that she had not seen a psychiatrist because of her lack of insurance. (R. at 433.) Amaya stated that she was taking her medications as prescribed. (R. at 433.) She said that her depression was better, although she still experienced some mood swings. (R. at 433.) Amaya stated that she had an appointment scheduled for the next day with a neurologist to evaluate her headaches, and she requested a prescription for additional Percocet until she could see the neurologist. (R. at 433.) Dr. Arey wrote Amaya another prescription for Percocet. (R. at 433.)

Amaya was briefly admitted to Twin County Regional Hospital with complaints of chest pain on February 14, 2007. (R. at 361-91.) Amaya complained of intermittent chest pain for the previous two weeks. (R. at 361.) Amaya reported a history of suffering a prior heart attack three years earlier when she overdosed on Xanax and was intubated. (R. at 361.) Amaya stated that, on this occasion, she awoke at 6:30 a.m. due to chest pain with nausea, which was relieved by taking her blood pressure medicine. (R. at 361.) Amaya stated that she went back to sleep and woke up at 9 a.m. with some nausea, but she went on to work. (R. at 361.) After work, she noticed some arm discomfort and went to the emergency room for

evaluation. (R. at 361.) In the emergency room, Amaya was given aspirin and nitroglycerine and her chest pain resolved. (R. at 361.) Amaya admitted to using marijuana, and a urine drug screen confirmed this. (R. at 362.) Amaya was evaluated by Dr. Manuel G. Firgau, M.D., who admitted her for further cardiac evaluation. (R. at 361-63.) After initial testing was negative for a heart attack, Amaya requested to be discharged that same evening from the hospital. (R. at 362.)

Amaya returned to see Dr. Arey on February 22, 2007, after being treating in the hospital overnight recently for complaints of chest pain and to rule out a heart attack. (R. at 435.) Dr. Arey noted that a cardiac stress test was scheduled for the next week. (R. at 435.) Amaya denied any chest pain since her discharge from the hospital. (R. at 435.) Amaya requested another refill of Percocet, but Dr. Arey denied her request "in light of her recent suicide attempt and [because] of fear of addiction problems." (R. at 435.) On February 26, 2007, however, Dr. Amy Butler, M.D., with Dr. Arey's office, authorized a prescription for Vicodin. (R. at 437.)

Dr. Arey saw Amaya on March 19, 2007, for complaints of a sore throat. (R. at 439.) Dr. Arey prescribed Zithromax. (R. at 440.) Amaya stated that she had been to counseling, but could not get an appointment with a psychiatrist. (R. at 439.) Dr. Arey again referred Amaya to a psychiatrist "per recommendation of court psychologist." (R. at 440.) Dr. Arey noted that Amaya was back at work. (R. at 439.) On June 27, 2007, Dr. Arey prescribed Topamax to treat Amaya's complaints of recurrent headaches. (R. at 442-43.) Dr. Arey noted that all neurological testing performed on Amaya had been normal. (R. at 442.)

Amaya treated with psychiatrists with The Center For Behavioral Health, from July 2007 to January 2008. (R. at 462-65.) On July 17, 2007, Amaya told Dr. Asim Rana, M.D., that she was doing better. (R. at 462.) She said that she was

doing well and not feeling down or depressed. (R. at 462.) She denied experiencing any mood swings, suicidal or homicidal ideations or audiovisual hallucinations. (R. at 462.) Dr. Rana noted that Amaya was taking Prozac, Klonopin and Abilify. (R. at 462.) Dr. Rana diagnosed bipolar disorder and panic disorder. (R. at 462.) On September 18, 2007, Amaya told Dr. Rana that her symptoms were unchanged, she was doing "alright" and not feeling down or depressed. (R. at 463.) She again denied any suicidal or homicidal ideations, hallucinations, panic attacks or other psychological symptoms. (R. at 463.) Dr. Rana continued Amaya's medications, but noted that she had stopped taking Topomax because it was not helping with her headaches. (R. at 463.) On December 11, 2007, Amaya again said that her symptoms were unchanged, and it was noted that she was doing very well. (R. at 464.) On January 15, 2008, she stated that her symptoms remained unchanged, and it was noted that her condition was stable on her medications. (R. at 465.) Amaya did not appear for an April 8, 2008, appointment. (R. at 465.)

Amaya returned to Dr. Arey on March 31, 2008. (R. at 470-72.) Dr. Arey noted that Amaya returned to her office after a long absence for refill of her medications. (R. at 470.) Dr. Arey stated that Amaya was slightly agitated, but was alert and oriented. (R. at 471.) Amaya stated that she was no longer working due to joint pain, and Dr. Arey noted that Amaya had gained more than 60 pounds since she had last seen her. (R. at 470.) Amaya complained of stiffness in her wrists, hips and knees upon awakening in the morning, but stated that the stiffness rapidly improved once she got up and moved around. (R. at 470.) Dr. Arey noted that Amaya asked for Vicodin for headaches, which she said that she occasionally had. (R. at 470.) Dr. Arey noted that she had been forced to "strictly control this in the past." (R. at 470.) Nonetheless, Dr. Arey wrote Amaya a prescription for Vicodin with no refills. (R. at 470.) Amaya told Dr. Arey that her siblings and father had schizophrenia, bipolar disorder and depression. (R. at 470.) Dr. Arey stated that she

-14-

did not think that Amaya needed any further testing for rheumatoid arthritis. (R. at 470.) She also talked to Amaya about Weight Watchers and the importance of reducing her caloric intake and trying to get some exercise. (R. at 470.)

Amaya saw Dr. Jenell R. Decker, M.D., with Medical Associates of Southwest Virginia, on August 18, 2008. (R. at 520.) Dr. Decker noted that Amaya was recently hospitalized for bipolar psychosis. (R. at 520.) Amaya told Dr. Decker that she was in North Carolina at the time and essentially wandered around for a day, not knowing where she was before she was hospitalized and started on medication. (R. at 520.) Amaya stated that she had done well since starting medication. (R. at 520.) Amaya stated that she was out of work, but looking for work as a waitress. (R. at 520.) Amaya complained of fatigue. (R. at 520.) Dr. Decker diagnosed Amaya with hypertension, bipolar disorder and fatigue and ordered blood work. (R. at 520.)

Amaya returned to see Dr. Decker on September 15, 2008, complaining of continuing fatigue. (R. at 519.) Amaya stated that she felt "achy" all the time and had chronic headaches since age 16. (R. at 519.) She stated that she did not sleep well. (R. at 519.) Dr. Decker prescribed Ambien. (R. at 519.) On October 16, 2008, Amaya continued to complain of headaches, stating that she had been under a lot of stress and tension. (R. at 518.) Dr. Decker prescribed Toradol and Phenergan. (R. at 518.)

On February 24, 2009, Amaya saw Stacey B. Gipe, PA-C, a physician's assistant with Medical Associates of Southwest Virginia, for follow up. (R. at 517.) Amaya told Gipe that she had a long history of anxiety and bipolar disorder. (R. at 517.) Amaya said she also had a history of prior heart attack and that she had been having some chest discomfort and pain. (R. at 517.) Amaya stated that she had not

had her heart checked in a couple of years and had not had a stress test in four to five years. (R. at 517.) Amaya stated that she had a heart attack because she had taken an accidental overdose of Xanax, and she denied being suicidal or depressed when this occurred. (R. at 517.) Amaya stated that she was very anxious and that she did not think the Prozac she was taking was working for her anxiety. (R. at 517.) Gipe stated that Amaya's affect was "actually OK." (R. at 517.) Gipe recommended further cardiac evaluation, which Amaya declined due to lack of insurance. (R. at 517.) Gipe prescribed lisinopril, Clonodine, Klonopin, Atenolol, Abilify and Depakote. (R. at 517.) Gipe discontinued Amaya's prescription for Prozac and added a prescription for Pristiq. (R. at 517.)

Amaya saw Gipe again on March 31, 2009, stating that she was "much, much better." (R. at 516.) Amaya stated that, since taking the Atenolol, she had not had any more chest pain. (R. at 516.) She stated that she had started getting a little manic so she had stopped her Depakote. (R. at 516.) Amaya stated that she thought the Pristiq had helped "a great deal." (R. at 516.) Amaya stated that she was ready to begin counseling. (R. at 516.) Gipe stated that Amaya's affect was very good and that she did not appear manic. (R. at 516.) Gipe started Amaya on Neurontin as a mood stabilizer, continued her other medications and referred her for counseling. (R. at 516.)

Amaya saw Dr. Christopher M. Basham, M.D., with Medical Associates of Southwest Virginia, for evaluation on May 12, 2009. (R. at 515.) Amaya gave a history of bipolar disorder and coronary disease. (R. at 515.) Amaya denied any difficulty with uncontrolled pain, any chest pressure, wheezing or cough. (R. at 515.) Dr. Basham diagnosed mood disorder and referred Amaya for psychiatric and cardiology evaluations. (R. at 515.)

A screening was performed on Amaya by Wise County Behavioral Health Services on July 21, 2009. (R. at 567-69.) Amaya stated that she was attempting to get her disability benefits due to difficulty getting out among people, anxiety and depression. (R. at 567.) Amaya said her depression went up and down, and she had panic attacks two to three times a week. (R. at 567.) Amaya stated that she had suffered from these problems for approximately 20 years and had been treated with medication by her treating physician. (R. at 567.) She said that she previously had been diagnosed with bipolar disorder. (R. at 567.) Amaya denied any hallucinations. (R. at 567.) She reported an accidental Xanax overdose six to seven years previously which resulted in a weeklong psychiatric admission. (R. at 567.) Amaya complained of insomnia without medication and some tearfulness. (R. at 567.)

An Outpatient Admission – Intake was completed on Amaya by James Kegley, MS, with Wise County Behavioral Health Services, on July 27, 2009. (R. at 572-93.) Amaya told Kegley that she had been referred by her treating physician, Dr. Basham, for treatment of a mood disorder. (R. at 572.) She said that she had suffered from depression since her mother was diagnosed with cancer when Amaya was 25 years old. (R. at 572.) Amaya said she could sleep only if medicated. (R. at 572.) She also complained of some irritability and tearfulness, but she denied any audio or visual hallucinations. (R. at 572.) Amaya stated that she was psychiatrically hospitalized about six years previously for seven days for an overdose of Xanax. (R. at 572.) Amaya stated that this overdose was not a suicide attempt. (R. at 572.) Also, she said that she treated on an outpatient basis at a behavioral health facility for about six months two to three years previously. (R. at 572.) Amaya states that she was diagnosed with bipolar disorder. (R. at 572.) Amaya denied any history of substance abuse. (R. at 572, 579.)

Amaya reported being unemployed due to disability, but stated that she suffered from no major health problems. (R. at 575.) Amaya reported suffering from depression and anxiety due to multiple life stressors. (R. at 577.) Kegley recommended individual mental health therapy. (R. at 577.) Amaya reported moderate decrease in energy or fatigue, moderate anxiety, moderate worrying, moderate distractibility, moderate indecisiveness, moderate memory impairment, moderate poor attention or concentration, moderate apathy, moderate depressed mood, moderate excessive or inappropriate guilt, moderate feelings of worthlessness, helplessness and hopelessness, moderate irritability, moderate loss of interest or pleasure, moderate tearfulness, mild destructive behavior, mild panic attacks, mild avoidance behavior, mild low self-esteem, mild insomnia and severe social withdrawal. (R. at 581-83.) Kegley diagnosed Amaya as suffering from a major depressive disorder, single episode, moderate; anxiety disorder, not otherwise specified; and nicotine dependence. (R. at 585.) Kegley placed Amaya's then-current Global Assessment of Functioning, ("GAF"), score at 50.[5] (R. at 585.) Amaya denied any major physical impairment. (R. at 589.)

Amaya saw Dr. Basham again on September 3, 2009. (R. at 513.) Amaya denied any complaint of headache, chest pain or pressure, shortness of breath, fever/chills, wheezing, cough or nausea/vomiting. (R. at 513.) Dr. Basham noted that Amaya had recently had a cardiology evaluation, and he was awaiting the report. (R. at 513.) Dr. Basham noted that Amaya's hypertension was well-controlled and that her mood disorder was improving. (R. at 513.)

---

[5] The GAF scale ranges from zero to 100 and "[c]onsider[s] psychological, social, and occupational functioning on a hypothetical continuum of mental health-illness." DIAGNOSTIC AND STATISTICAL MANUAL OF MENTAL DISORDERS FOURTH EDITION, ("DSM-IV"), 32 (American Psychiatric Association 1994). A GAF score of 41-50 indicates that the individual has serious symptoms or any serious impairment in social, occupational or school functioning. *See* DSM-IV at 32.

B. Wayne Lanthorn, Ph.D., a licensed clinical psychologist, performed a psychological evaluation of Amaya on September 10, 2009, at the request of the state agency. (R. at 473-78.) Lanthorn stated that Amaya was claiming disability due to bipolar disorder, anxiety, depression, social phobia, heart problems and high blood pressure. (R. at 473.) Amaya told Lanthorn that she had been diagnosed with some form of heart condition about seven years earlier, but she recently had undergone a stress test which was "generally negative." (R. at 474.) Amaya denied the current use of alcohol and reported that she had "quit the use of marijuana sometime ago." (R.at 475.) Amaya said that she had been "in and out" of counseling and seen various psychiatrists over the years, beginning at age 25. (R. at 475.)

Lanthorn noted that Amaya was oriented in all spheres, her affect was generally flat and blunt, and her mood was predominantly depressed. (R. at 473, 475-76.) He noted that she became tearful at several points during the interview. (R. at 474-75.) Amaya claimed that, prior to taking her current psychotropic medication, she had both visual and auditory hallucinations. (R. at 476.) Lanthorn stated that Amaya did not appear to be experiencing any delusional thinking or any active hallucinations. (R. at 476.) In fact, Lanthorn stated, that Amaya did not exhibits any signs of ongoing psychotic processes or any evidence of delusional thinking. (R. at 476.) Lanthorn stated that it appeared that Amaya was functioning in the low average range of intelligence. (R. at 476.)

Amaya stated that she preferred to be alone, but she denied irritability and suicidal or homicidal ideations, plans or intent. (R. at 476.) She reported a low degree of energy, but a high degree of sex drive. (R. at 476.) She reported that her antidepressant medication was somewhat helpful, but she still did not enjoy much of anything anymore. (R. at 476.) She said that she cried frequently. (R. at 476.)

Amaya claimed that she had "upward spirals of energy that lasts for days" and would become overtalkative, loud, would overspend, become hypersexualized and very moody with frequent racing thoughts. (R. at 476.) Amaya stated that she had suffered from panic attacks for many years, during which her heart would race, she would hyperventilate, become dizzy, and she would feel like she was having a heart attack and "flying to pieces." (R. at 477.) She stated that she had these attacks weekly and that each would last 15 to 30 minutes. (R. at 477.) She stated that she slept 12 to 14 hours a day. (R. at 477.)

Lanthorn diagnosed Amaya with bipolar disorder, most recent episode mixed; rule out panic disorder without agoraphobia; and rule out personality disorder. (R. at 477.) He placed Amaya's then-current GAF score at 55-60.[6] (R. at 477.) Lanthorn stated that Amaya's prognosis was guarded, but that she did better when receiving ongoing psychiatric and psychotherapeutic intervention. (R. at 477.)

Lanthorn stated that Amaya should have no difficulties learning simple tasks, but that more complicated tasks might present moderate or greater limitations. (R. at 478.) He stated that Amaya would have mild to moderate limitations interacting with others in the work setting and in dealing with changes and the requirements of the work setting. (R. at 478.) He stated that Amaya would have mild or slightly greater difficulties sustaining concentration and persisting at tasks. (R. at 478.)

---

[6] A GAF score of 51-60 indicates that the individual has moderate symptoms or moderate difficulty in social, occupational, or school functioning. *See* DSM-IV at 32.

State agency physician Dr. Robert McGuffin, M.D., performed a case analysis[7] on September 15, 2009, and stated that Amaya did not suffer from a severe physical impairment. (R. at 88.)

State agency psychologist Richard J. Milan, Jr., Ph.D., completed a Psychiatric Review Technique form, ("PRTF"), on Amaya on September 17, 2009. (R. at 88-89.)[8] Milan stated that the evidence of record showed that Amaya suffered from an affective disorder and an anxiety disorder. (R. at 88.) Milan stated that these impairments resulted in no restrictions on activities of daily living, moderate difficulties in maintaining social functioning, moderate difficulties in maintaining concentration, persistence or pace and no repeated episodes of decompensation of extended duration. (R. at 88-89.)

Milan also completed a Mental Residual Functional Capacity Assessment[9] stating that Amaya was not significantly limited in her ability to remember locations and work-like procedures, to understand, remember and carry out very short and simple instructions, to sustain and ordinary routine without special supervision, to work in coordination with or in proximity to others without being distracted by them, to ask simple questions or request assistance, to accept instructions and respond appropriately to criticism from supervisors, to get along with co-workers or peers without distracting them or exhibiting behavioral extremes or to maintain socially appropriate behavior and to adhere to basic

---

[7] The only evidence of this contained in the Record is found in the Initial Disability Determination Explanation. (R. at 78, 88.)

[8] The only evidence of this contained in the Record is found in the Initial Disability Determination Explanation. (R. at 78-79, 88-89.)

[9] The only evidence of this contained in the Record is found in the Initial Disability Determination Explanation. (R. at 80-81, 90-91.)

Case 2:13-cv-00020-PMS   Document 18   Filed 09/16/14   Page 21 of 43   Pageid#: 741

standards of neatness and cleanliness. (R. at 90-91.) Milan stated that Amaya was moderately limited in her ability to understand, remember and carry out detailed instructions, to maintain attention and concentration for extended periods, to perform activities within a schedule, maintain regular attendance and be punctual within customary tolerances, to complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods and to interact appropriately with the general public. (R. at 90-91.)

Milan stated that there was no evidence that Amaya's ability to make simple work-related decisions was limited. (R. at 90.) Milan also stated that Amaya could understand and remember simple work instructions and work locations/procedures, concentrate and persist at simple work duties, completing tasks within a schedule and under ordinary supervision, interact appropriately with people and adapt to changing activities within the workplace and meet the basic demands of competitive work on a regular, ongoing basis, despite the limitations from her mental impairment. (R. at 90-91.)

Dr. Kevin Blackwell, D.O., performed a consultative evaluation on Amaya on or about September 17, 2009, at the request of the state agency. (R. at 480-84.) Dr. Blackwell stated that Amaya's chief complaints were bipolar disorder, anxiety, depression and heart problems. (R. at 480.) Amaya stated that she had been told in the past that she may have had a heart attack, but she had never had any evaluation to determine whether this had occurred. (R. at 480.) Amaya stated that she had suffered from high blood pressure for five to seven years; her blood pressure reading on this occasion was 110/64. (R. at 480-81.) Amaya said that she suffered from chest discomfort, which made her feel like she could not take a deep breath, on two or three occasions a week. (R. at 480.)

Dr. Blackwell noted that Amaya was alert, cooperative and oriented with good mental status. (R. at 482.) Amaya's physical examination was normal. (R. at 481-82.) Dr. Blackwell diagnosed Amaya with hypertension/history of chest pain, bipolar disease, by history, and anxiety. (R. at 482.) Dr. Blackwell stated that Amaya should be able to sit for eight hours in an eight-hour workday and to stand for two hours out of an eight-hour workday with positional changes every two hours. (R. at 483.) He stated that Amaya could bend at waist level, kneel, squat, above head reach with either arm with a load of up to 10 pounds and operate foot pedals for up to one-third of the day. (R. at 483.) Dr. Blackwell said that Amaya should avoid unprotected heights or ladder climbing. (R. at 483.) He said that Amaya could climb four flights of stairs before resting, could occasionally lift items weighing up to 40 pounds and could frequently lift items weighing up to 15 pounds. (R. at 483.)

Amaya returned to see Dr. Basham on January 20, 2010, complaining of "some type of episode lasting several minutes where she 'zoned out' and had some rhythmic movements of right hand." (R. at 512.) She complained of "continued difficulty with headaches." (R. at 512.) Amaya also complained of a feeling of tightness and "rubber band sensation" of the left humerus and pain to palpation along the rotator cuff tendon of the left shoulder area, for which Dr. Basham provided an injection of cortical steroids. (R. at 512.) Dr. Basham advised Amaya not to drive until she had been free of possible seizure activity for six months. (R. at 512.) Dr. Basham again prescribed Depakote and recommended a neurological consult. (R. at 512.)

Despite requesting services, it appears that Amaya did not actually attend any sessions with Kegley until January 20, 2010. (R. at 557.) On this date, Amaya told Kegley that she had another "episode" the prior week while at a family dinner

where she was unaware of who she was or what she was doing for about 20 minutes. (R. at 557.) Amaya said, "I'm so nervous and can't get my insides to stop twitching" and "I'm fighting to keep myself intact without losing it." (R. at 557.) She said, "I keep everything inside me," but "on the inside I'm fighting to keep myself together." (R. at 557.) Amaya said she felt guilt over leaving her two children when she left her 18-year controlling marriage. (R. at 557.) Amaya said that her greatest source of stress was not having a place to live or a way to take care of herself. (R. at 557.) She said that she had a pending claim for disability benefits. (R. at 557.) Amaya said, "I do nothing" and "I have no reason; I have no purpose." (R. at 557.)

Kegley stated that Amaya's mood ranged from moderately to severely depressed with congruent affect. (R. at 557.) Kegley encouraged Amaya to develop some time for herself or some activities to pursue, such as reading, which she used to enjoy. (R. at 557.) Kegley asked Amaya to begin walking and to go to the library at least once before her next appointment. (R. at 557.) Kegley also recommended adoption of a regular daily routine. (R. at 557.)

Amaya returned on February 3, 2010, reporting no more "episodes" since her last visit. (R. at 554.) Amaya stated that Dr. Basham was referring her to a neurologist to attempt to determine the cause of her spells. (R. at 554.) Amaya said, "I'm just numb" and "I'm so good at putting on a face" to keep other people from knowing exactly how she is feeling. (R. at 554.) Amaya stated that she stayed at home a lot, which she said was her "safe zone." (R. at 554.)

Kegley's records show that he complied with Amaya's counsel's request for information concerning her disability claims on February 12, 2010. (R. at 553.) After that, Amaya missed appointments on February 17 and 26, 2010. (R. at 549-

52.) Amaya returned to see Kegley on March 17, 2010. (R. at 546.) Amaya complained of transportation problems, but she stated that she did not want to ride the Mountain Empire Older Citizen's van because of her depression. (R. at 546.) Amaya stated that her depression was so bad that she did not want to do anything. (R. at 546.) She stated that a person would have to be around her to realize the full extent of her depression. (R. at 546.) Amaya complained of no energy and days when she did not even want to take a shower. (R. at 546.) Amaya stated that she did not have any strengths, and she stated that her self-esteem was low. (R. at 546.) Amaya did say that she recently had attended a baby shower for her grandson in an effort to get out of the house more. (R. at 546.)

On April 14, 2010, Amaya complained of being so "manic" that she had not slept in two days. (R. at 543.) She said that she was so manic that she had "cleaned everything there [was] to clean." (R. at 543.) Amaya complained of hurting and aching joints due arthritis. (R. at 543.) Amaya stated that she had appealed a denial of her disability benefits. (R. at 543.) When asked about the possibility of returning to employment, Amaya responded, "mentally, no I can't" go back. (R. at 543.) Kegley noted that Amaya appeared somewhat disheveled and admitted that she had not bathed. (R. at 543.) Kegley noted that Amaya's mood ranged from moderately to severely depressed. (R. at 543.) Amaya stated that she did not want to discuss anything "heavy" saying, "I really don't want to talk." (R. at 543.)

Amaya was seen at Lonesome Pine Hospital on April 24, 2010, for abnormal behavior and hallucinations. (R. at 486-89.) The treating physicians requested a mental health consultation. (R. at 486.) The medical record states that Amaya attempted suicide by intentional drug overdose. (R. at 488-89.) A urine drug screen tested positive for the use of marijuana and opioids. (R. at 489.)

That same evening, Ben Jones completed a Uniform Preadmission Screening and Report Form, recommending that Amaya be involuntary committed for psychiatric evaluation and treatment. (R. at 492-99.) Jones stated that Amaya presented as confused with pressured and slurred speech. (R. at 493.) Jones stated that Amaya was brought to the emergency room of a local hospital after her family found her trying to call her mother who died in 1998. (R. at 493.) Amaya was disoriented to time and place. (R. at 493.) She reported being up all times of the night doing household chores because she was unable to sleep. (R. at 493.) Jones noted that Amaya thought it was October 24 and that she was at Holston Valley Hospital. (R. at 493.) Jones described Amaya as unkempt and manic. (R. at 493.) Amaya stated that she had felt her dead mom sit on the couch beside her and brush against her. (R. at 493.)

Jones diagnosed Amaya with a major depressive episode, single episode, moderate; and anxiety disorder, not otherwise specified. (R. at 494.) Jones placed Amaya's GAF score at 35.[10] (R. at 494.) Jones recommended involuntary commitment because Amaya was confused, disoriented and hallucinating and unable to provide for her basic needs and could engage in behavior that could lead to harm, although she denied suicidal or homicidal ideations. (R. at 494.) Jones noted that Amaya admitted to smoking marijuana and taking Lortab off the streets in addition to taking her prescribed medications. (R. at 495.) Jones also stated that two prescriptions belonging to someone else were found in Amaya's purse and confiscated by police. (R. at 498.) Jones noted that Amaya's son reported that his mother had experienced similar symptoms while taking Depakote. (R. at 495.)

---

[10] A GAF score of 31-40 indicates that the individual has some impairment in reality testing or communication or major impairment in several areas, such as work or school, family relations, judgment, thinking or mood. *See* DSM-IV at 32.

An Admission History And Mental Status Examination form from Southwestern Virginia Mental Health Institute, ("SVMHI"), stated that Amaya was admitted at 3:13 a.m. on April 25, 2010, based on a temporary detention order. (R. at 505-06.) The form stated that Amaya was picked up by a relative who worked as a sheriff's deputy for behaving strangely. (R. at 505.) Amaya described episodes of "not being aware of herself." (R. at 505.) She stated during a similar episode in January she experienced visual hallucinations. (R. at 505.) The evaluator noted that Amaya's mood was depressed, and Amaya complained of not sleeping well. (R. at 505.) She stated that she felt hopeless about her job prospects, but not about life in general. (R. at 505.) She denied suicidal or homicidal ideations. (R. at 505.)

Amaya gave a history of bipolar disorder with a prior psychiatric hospitalization due to an overdose of Xanax. (R. at 505.) The evaluator checked that Amaya's recent and remote memory were both intact and impaired. (R. at 506.) The evaluator checked that Amaya's insight was limited, and her judgment was poor. (R. at 506.) The evaluator also checked that Amaya had a past suicide attempt, but that she denied any current suicidal or homicidal thoughts. (R. at 506.) The evaluator stated that Amaya was under moderate risk of progression of her illness, but only minimal risk of harming herself or others. (R. at 506.) The evaluator also checked that current weaknesses of Amaya's condition were family turmoil, impulsivity, anxiety and substance abuse. (R. at 506.) A General Medical History And Physical Examination completed that same date by Dr. Nadia Meyer stated that Amaya suffered from hypertension and headaches, but denied any current pain problems. (R. at 507.)

Amaya was discharged from SVMHI the next day on April 26, 2010. (R. at 501-04.) In a Short Stay Discharge Summary completed by Dr. James R. Driver, M.D., Amaya's chief complaints were listed as depressed mood; insomnia; feelings

of hopelessness regarding job prospects, but not life in general, no suicidal ideation; and significant stress over discovering recently her significant other had been having an affair. (R. at 501.) Amaya stated that she discovered this by finding inappropriate message on her significant other's cell phone. (R. at 501.) Dr. Driver stated that Amaya's recent episodes of not being aware of herself coincided with her abuse of marijuana and opioids, and he suspected the two "were related." (R. 501.)

Dr. Driver stated that, based on his evaluation, Amaya's previous diagnosis with a bipolar disorder was very suspect. (R. at 501.) Following her admission, Amaya's dosage of Klonopin was reduced, and by the time of her evaluation by a treatment team, she stated that she was feeling anxious and repeatedly requesting Klonopin. (R. at 501.) Dr. Driver noted that Amaya stabilized quickly and no longer met the criteria for hospitalization. (R. at 501.) Dr. Driver diagnosed Amaya with an adjustment disorder, anxiety disorder, nicotine addiction, narcotic abuse, marijuana abuse and rule out benzodiazepine abuse. (R. at 501-02.) Dr. Driver placed Amaya's then-current GAF score at 60. (R. at 502.) Dr. Driver noted that Amaya's condition on discharge was markedly improved. (R. at 502.)

Dr. Driver noted that, at the time of her discharge, Amaya was mildly anxious with no odd mannerisms. (R. at 502.) She was oriented and slightly depressed with no suicidal or homicidal ideations. (R. at 502.) Her cognition was clear and coherent, and she was experiencing no delusions, hallucinations or illusions. (R. at 502.) Dr. Driver noted that Amaya's recent and remote memory was intact. (R. at 503.) She had limited insight and fair judgment. (R. at 503.) Dr. Driver stated that Amaya was at minimal risk of progression of illness or of harming herself or others. (R. at 503.) Dr. Driver stated that, at the time of her

admission, Amaya's urine drug screen tested positive for the use of marijuana, benzodiazepines and opioids. (R. at 503.)

Amaya returned to see Dr. Basham on April 28, 2010. (R. at 511.) Amaya reported that she had been admitted to SVMHI for "control for some type of problem she experienced." (R. at 511.) Amaya stated that she was feeling better since her discharge and was without complaints. (R. at 511.) Amaya stated that she did not feel any improvement with a steroid injection in her left shoulder on the last visit. (R. at 511.) In addition to a tight feeling and tenderness to palpation in her left shoulder, Amaya stated that her arm felt numb. (R. at 511.)

On May 6, 2010, Amaya saw Joyce Thompson, FNP, a nurse practitioner working with Dr. Rhonda K. Bass, M.D., Staff Psychiatrist for medication management after apparently being discharged from SVMHI. (R. at 532-34.) Thompson noted that Amaya was taking Klonopin, Clonidine, Depakote, Atenolol, Neurontin, Pristiq and Abilify. (R. at 532.) Amaya said that she had been depressed for 25 years, but that it had been worse lately. (R. at 532.) She also complained of being anxious and moody. (R. at 532.) Thompson noted that Amaya had been treated inpatient at SVHMI April 25-26, 2010, due to depressed mood, insomnia, feelings of hopelessness regarding job prospects and significant stress over discovering recently that her significant other had been having an affair. (R. at 532.) Thompson stated that crisis screening notes reflected that Amaya was having tactile and visual hallucinations, anxiety, cleaning her house at night and calling her dead mother. (R. at 532.) She also noted that Amaya had two bottles of another person's medication on her when she entered the hospital. (R. at 532.) Thompson stated that, on admission to SVHMI, Amaya's urine drug screen was positive for use of marijuana, benzodiazepines and opioids. (R. at 532.) Thompson stated that Amaya previously had received substance abuse counseling at Wise County

Behavioral Health Services and had been treated at the Life Center in 2004. (R. at 532.)

Amaya told Thompson that she had taken a Lortab two days previous for a headache and had been using marijuana occasionally with the last time being one and a half weeks previous. (R. at 532.) Amaya stated that she was living with her aunt. (R. at 533.) Thompson noted that rapport with Amaya was not easily established, stating that Amaya was very hesitant to discuss any issues. (R. at 533.) Thompson stated that Amaya's speech was clear, coherent and relevant and she maintained good eye contact with no abnormal psychomotor activity identified. (R. at 533.) Thompson stated that Amaya's cognitive function was grossly intact with average general fund of information. (R. at 533.) Amaya denied any suicidal or homicidal ideations or any auditory or visual hallucinations. (R. at 533.) Amaya denied any use of alcohol or illicit substances at that time. (R. at 533.) Thompson diagnosed Amaya with an adjustment disorder, major depressive disorder and cannabis and opioid abuse. (R. at 533.) Thompson placed Amaya's then-current GAF score at 65-70.[11] (R. at 533.)

Amaya also met with Kegley for individual therapy on May 6, 2010. (R. at 531.) Amaya stated that she was in the process of moving out of her boyfriend's house and into her sister's house when she "cracked." (R. at 531.) She said she was devastated to recently find out that her boyfriend was being unfaithful with another woman. (R. at 531.) Amaya stated that she had been depressed for about 25 years and had used opiates and smoke marijuana "off and on" for about 10 years because

---

[11] A GAF score of 61-70 indicates some mild symptoms or some difficulty in social, occupational or school functioning, but generally functioning pretty well, has some meaningful interpersonal relationships. *See* DSM-IV at 32.

it made her feel good. (R. at 531.) Amaya stated that she was addicted to Klonopin. (R. at 531.)

On May 20, 2010, Kegley noted that Amaya was mildly depressed. (R at 530.) Amaya stated that she recently had visited relatives in North Carolina for a week. (R. at 530.) Amaya stated that she relaxed while she was there and slept soundly when out of the immediate area. (R. at 530.) Amaya returned on June 8, 2010, stating that her nerves were "God awful." (R. at 527.) Amaya said that she had good days and bad days. (R. at 527.) Amaya stated that she was traveling to North Carolina to provide child care for a relative for the summer school break. (R. at 527.)

State agency physician Dr. Michael Hartman, M.D., completed a Physical Residual Functional Capacity Assessment on Amaya on May 10, 2010.[12] (R. at 119-21.) Dr. Hartman stated that Amaya could occasionally lift and/or carry items weighing up to 50 pounds and frequently lift and/or carry items weighing up to 25 pounds. (R. at 120.) Dr. Hartman stated that Amaya could stand and/or walk, with normal breaks, for a total of about six hours in an eight-hour workday and sit, with normal breaks, for about six hours in an eight-hour workday. (R. at 120.) Dr. Hartman stated that Amaya could never climb ladders/ropes/scaffolds, could occasionally climb ramps and stairs and could frequently balance, stoop, kneel, crouch and crawl. (R. at 120.) He did state that Amaya should avoid all exposure to hazards such as machinery and heights. (R. at 121.)

---

[12] The only evidence of this contained in the Record is found in the Disability Determination Explanation on reconsideration. (R. at 104-06, 119-21.)

State agency psychologist Joseph Leizer, Ph.D., completed a PRTF on Amaya on May 12, 2010. (R. at 117-18.)[13] Leizer stated that the evidence of record showed that Amaya suffered from an affective disorder and an anxiety-related disorder. (R. at 117.) Leizer stated that these impairments resulted in no restrictions of activities of daily living, moderate difficulties in maintaining social functioning, mild difficulties in maintaining concentration, persistence or pace and no repeated episodes of decompensation of extended duration. (R. at 117.) Leizer stated that his review raised questions about the veracity of Amaya's mental health complaints. (R. at 118.) Leizer noted that symptoms of anxiety and depression had been consistently documented, but there were no references to impairment in reality contact, disturbances in logic, bizarre behavior, social isolation or peculiar thinking. (R. at 118.) Therefore, he stated that Amaya's claims of auditory and visual hallucinations were not fully credible. (R. at 118.) Leizer further stated that it appeared that Amaya retained the mental capacity to perform all levels of nonstressful work. (R. at 118.)

Leizer also completed a Mental Residual Functional Capacity Assessment[14] stating that Amaya had no understanding or memory limitations and no sustained concentration and persistence limitations. (R. at 121-22.) Leizer also said that Amaya was not significantly limited in her ability to ask simple questions, to request assistance, to get along with co-workers or peers without distracting them or exhibiting behavioral extremes or to maintain socially appropriate behavior and to adhere to basic standards of neatness and cleanliness. (R. at 121-22.) Leizer did say that Amaya was moderately limited in her ability to interact appropriately with

---

[13] The only evidence of this contained in the Record is found in the Disability Determination Explanation on reconsideration. (R. at 102-03, 117-18.)

[14] The only evidence of this contained in the Record is found in the Disability Determination Explanation on reconsideration. (R. at 106-07, 121-22.)

Case 2:13-cv-00020-PMS   Document 18   Filed 09/16/14   Page 32 of 43   Pageid#: 752

the general public and to accept instructions and respond appropriately to criticism from supervisors. (R. at 121.)

Amaya was discharged from outpatient mental health treatment at Wise County Behavioral Health on January 31, 2011, for her failure to attend group sessions and failure to return for further services or respond to attempts to contact her. (R. at 604-05.)

Dr. Basham completed a Medical Assessment Of Ability To Do Work-Related Activities (Mental) on March 21, 2011. (R. at 601-03.) Dr. Basham stated that Amaya had a good or limited, but satisfactory, ability to perform all occupational, performance and personal-social adjustments except for a seriously limited ability to understand, remember and carry out detailed, but not complex, job instructions, to behave in an emotionally stable manner and to relate predictably in social situations and poor or no ability to deal with the public, to deal with work stresses, to function independently, to maintain attention and concentration and to demonstrate reliability. (R. at 601-02.) Dr. Basham also stated that Amaya was experiencing "[e]pisodes of mental status changes noted with ongoing neurology evaluation pending for etiology. Unclear etiology with no definite cause determined [at] this point." (R. at 603.) Dr. Basham also stated that Amaya would be absent from work more than two day a month. (R. at 603.)

On referral by her attorney, Amaya was evaluated by Robert S. Spangler, Ed.D., a licensed psychologist, on October 8, 2011. (R. at 632-38.) Amaya reported past marijuana and opioid abuse, but denied current use of any nonprescription drugs. (R. at 632.) Spangler noted that during the interview Amaya seemed socially confident, anxious and depressed. (R. at 633.) He stated that Amaya demonstrated erratic concentration secondary to lability and

-33-

tearfulness. (R. at 633.)  Spangler noted that Amaya was appropriately persistent on tasks, but her pace was impacted by emotional lability and tearfulness. (R. at 633.) Spangler noted that Amaya was alert and oriented, had an adequate recall of remote and recent events, had fair eye contact, tense motor activity, congruent affect, depressed mood and was anxious. (R. at 634.) He noted that Amaya was cooperative, compliant and forthcoming. (R. at 634.)  He said she related well to the examiner. (R at 635.) Spangler stated that Amaya's stream of thought was unremarkable, her associations were logical, her thought content was nonpsychotic, and no perceptual abnormalities were noted. (R. at 635.) Spangler opined that Amaya appeared to be functioning in the average range of intelligence. (R. at 635.) He also stated that delusional thoughts were not evident. (R. at 635.)

Amaya told Spangler that her medical and mental problems began at age 25 when her mother was diagnosed with cancer. (R. at 633.)  Amaya said that she experienced a long period of intense stress followed by grief upon her mother's death followed by the onset of long standing depression which had worsened. (R. at 633.) Amaya claimed that there were days when she would not get out of the bed. (R. at 633.)  She said her father's recent death had exacerbated her depression. (R. at 633.) Amaya complained of suffering from panic attacks about twice a week and other incidents when she would lose track and stare into space about three times a week. (R. at 633.) Amaya claimed that she suffered from frequent headaches and hypertension. (R. at 633.) She said that she had suffered a heart attack at age 39. (R. at 633.) Amaya also said that she had been psychiatrically hospitalized twice, once when she accidentally overdosed on Xanax. (R. at 633.) She also claimed she suffered from seizures and chronic foot and ankle pain. (R. at 638.)

Amaya told Spangler that she had worked previously as a licensed practical nurse, but her L.P.N. license had been suspended due to lack of emotional stability in 2005. (R. at 634.) Amaya said she lived with her aunt. (R. at 634.) Amaya stated that she last worked as a restaurant hostess, but she said she quit this job because she could not deal with the public and was having more panic attacks. (R. at 634.)

Amaya told Spangler that she arose at 6 a.m. (R. at 635.) She stated that she shared cooking, cleaning and laundry responsibilities with her aunt. (R. at 635.) Amaya reported problems sleeping due to foot and ankle pain and chronic worrying about major life functions. (R. at 635.) Amaya complained that her mind "[wouldn't] shut down." (R. at 635.) Amaya said her bad days outnumbered her good days by a 6 to 1 ratio. (R. at 635.) Spangler noted that, due to emotional liability, a protective payee should be appointed to administer benefits if awarded. (R. at 635.)

Spangler administered the Weschler Adult Intelligence Scale – Fourth Edition, ("WAIS-IV"), but he found most of the results invalid. (R. at 636.) Spangler stated that testing showed that Amaya's full-scale IQ score was 82. (R. at 637.) Spangler diagnosed bipolar disorder, severe; generalized anxiety disorder, moderate to severe; polysubstance abuse in full remission; nicotine dependence; and rule out panic disorder without agoraphobia. (R. at 637.) Spangler stated that Amaya's prognosis was guarded and that she needed to continue her mental health treatment for a period to exceed 12 months. (R. at 638.)

Spangler also completed a Medical Assessment Of Ability To Do Work-Related Activities (Mental) on Amaya on November 5, 2011. (R. at 639-41.) Spangler stated that Amaya had a seriously limited ability resulting in inadequate work performance, to make all occupational, performance and personal-social

-35-

adjustments, except for a poor or no ability to deal with work stresses, to understand, remember and carry out complex and detailed job instructions and to demonstrate reliability. (R at 639-40.) Spangler stated that Amaya's erratic concentration and slowed pace would impact her ability to carry out even simple tasks in a timely manner. (R. at 640.)

Amaya was seen by Dr. Noah Kolb, M.D., a neurology resident with the University of Virginia Health System, on November 3, 2011, regarding her "spells." (R. at 647-49.) Amaya described two types of spells. (R. at 647.) One during which she would become hysterical, felt like she was going to die, cry and repeat herself over and over. (R. at 647.) The other during which she would blankly stare for 30-45 minutes. (R. at 647.) She is distractible during these episodes. (R. at 647.) Amaya complained of multiple episodes each day. (R. at 647.) She claimed that she had broken both of her ankles with falls. (R. at 647.) She denied any incontinence or tongue biting with any spell. (R. at 647.)

Dr. Kolb noted that Amaya previously had undergone and MRI and EEG, both of which were read as normal. (R. at 647.) Amaya complained of fatigue, sleepiness, blurry vision, joint and muscle pain, headache and anxiety. (R. at 648.) Amaya stated that she had been taking Depakote and that she believed that this had decreased the frequency of her spells to one day of two to three staring spells once a week. (R. at 647.) Dr. Kolb noted that Amaya was alert and fully oriented, her mood and affect were appropriate, her attention span was normal, her fund of knowledge was full, her recent and remote memory was intact, and her speech and language function was normal. (R. at 648.) Dr. Kolb's neurological examination produced normal results. (R. at 648.)

Dr. Kolb stated that, based on Amaya's description of her spells, he believed that they likely were not epileptic spells. (R. at 648.) He stated that he informed Amaya that they were more likely related to anxiety and stress, and Amaya agreed. (R. at 648.) Dr. John Mytinger, M.D., an attending neurologist, concurred in the assessment of Amaya's condition. (R. at 649.)

## III. Analysis

The Commissioner uses a five-step process in evaluating DIB and SSI claims. *See* 20 C.F.R. §§ 404.1520, 416.920 (2013). *See also Heckler v. Campbell*, 461 U.S. 458, 460-62 (1983); *Hall v. Harris*, 658 F.2d 260, 264-65 (4th Cir. 1981). This process requires the Commissioner to consider, in order, whether a claimant 1) is working; 2) has a severe impairment; 3) has an impairment that meets or equals the requirements of a listed impairment; 4) can return to her past relevant work; and 5) if not, whether she can perform other work. *See* 20 C.F.R. §§ 404.1520, 416.920. If the Commissioner finds conclusively that a claimant is or is not disabled at any point in this process, review does not proceed to the next step. *See* 20 C.F.R. §§ 404.1520(a), 416.920(a) (2013).

Under this analysis, a claimant has the initial burden of showing that she is unable to return to her past relevant work because of her impairments. Once the claimant establishes a prima facie case of disability, the burden shifts to the Commissioner. To satisfy this burden, the Commissioner must then establish that the claimant has the residual functional capacity, considering the claimant's age, education, work experience and impairments, to perform alternative jobs that exist in the national economy. *See* 42 U.S.C.A. §§ 423(d)(2)(A), 1382c(a)(3)(A)-(B) (West 2011 & West 2012); *McLain v. Schweiker*, 715 F.2d 866, 868-69 (4th Cir.

1983); *Hall*, 658 F.2d at 264-65; *Wilson v. Califano*, 617 F.2d 1050, 1053 (4th Cir. 1980).

By decision dated December 15, 2011, the ALJ denied Amaya's claims. (R. at 14-26.) The ALJ found that Amaya met the disability insured status requirements of the Act for DIB purposes through June 30, 2010. (R. at 16.) The ALJ found that Amaya had not engaged in substantial gainful activity since May 15, 2007, the alleged onset date. (R. at 16.) The ALJ found that the medical evidence established that Amaya had severe impairments, namely affective disorder (bipolar disorder and depression), anxiety disorder, history of drug abuse and obesity, but the ALJ found that Amaya did not have an impairment or combination of impairments that met or medically equaled one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1. (R. at 16, 18.) The ALJ found that Amaya had the residual functional capacity to perform light work that did not require her to climb ladders, ropes or scaffolds, to be exposed to unprotected heights or more than occasionally climbing ramps or stairs, balancing, stooping, kneeling, crouching, crawling, operating foot controls or reaching. (R. at 20.) The ALJ found that Amaya was able to understand, remember and carry out simple instructions, to make judgments on simple work-related decisions, to interact appropriately with supervisors and co-workers in a routine work setting and to respond to usual work situations and to changes in a routine work setting. (R. at 20.) The ALJ also found that Amaya should be isolated from the public with only occasional supervision and occasional interaction with co-workers. (R. at 20.) The ALJ found that Amaya was unable to perform any of her past relevant work. (R. at 24.) Based on Amaya's age, education, work experience, residual functional capacity and the testimony of a vocational expert, the ALJ found that a significant number of jobs existed in the national economy that Amaya could perform, including jobs as merchandise marker, a machine tender and a checker. (R. at 24-

25.) Thus, the ALJ concluded that Amaya was not under a disability as defined by the Act and was not eligible for DIB or SSI benefits.  (R. at 25-26.) *See* 20 C.F.R. §§ 404.1520(g), 416.920(g).

In her brief, Amaya argues that the ALJ's finding as to her residual functional capacity is not supported by the substantial evidence of record. (Plaintiff's Motion For Summary Judgment And Memorandum Of Law, ("Plaintiff's Brief"), at 5-6.) In particular, Amaya argues that the ALJ erred by failing to give full consideration to the opinions of Spangler as to the severity and effect of her mental impairments.  (Plaintiff's Brief at 7-8.)

As stated above, the court's function in this case is limited to determining whether substantial evidence exists in the record to support the ALJ's findings. This court must not weigh the evidence, as this court lacks authority to substitute its judgment for that of the Commissioner, provided her decision is supported by substantial evidence. *See Hays*, 907 F.2d at 1456. In determining whether substantial evidence supports the Commissioner's decision, the court also must consider whether the ALJ analyzed all of the relevant evidence and whether the ALJ sufficiently explained his findings and his rationale in crediting evidence. *See Sterling Smokeless Coal Co. v. Akers*, 131 F.3d 438, 439-40 (4th Cir. 1997).

Thus, it is the ALJ's responsibility to weigh the evidence, including the medical evidence, in order to resolve any conflicts which might appear therein. *See Hays*, 907 F.2d at 1456; *Taylor v. Weinberger*, 528 F.2d 1153, 1156 (4th Cir. 1975.)  Furthermore, while an ALJ may not reject medical evidence for no reason or for the wrong reason, *see King v. Califano*, 615 F.2d 1018, 1020 (4th Cir. 1980), an ALJ may, under the regulations, assign no or little weight to a medical opinion, even one from a treating source, based on the factors set forth at 20 C.F.R. §§

404.1527(c), 416.927(c), if he sufficiently explains his rationale and if the record supports his findings.

I first will address the ALJ's weighing of the psychological evidence, and, in particular, his failure to give controlling weight to the opinions of psychologist Spangler. The ALJ stated that he was assigning little weight to Spangler's opinions because they were based on a one-time evaluation, they were based largely on Amaya's subjective complaints and they were inconsistent with his own evaluation notes. (R. at 24.) Based on my review of the record, I find that the weighing of the psychological evidence is supported by substantial evidence.

In his Medical Assessment Of Ability To Do Work-Related Activities (Mental), Spangler stated that Amaya had a seriously limited ability resulting in inadequate work performance, or a poor to no ability to make all occupational, performance and personal-social adjustments. (R at 639-40.) In his report, however, Spangler stated that Amaya seemed socially confident, (R. at 633), she was appropriately persistent on tasks, (R. at 633), she had an adequate recall of remote and recent events, (R. at 634), she was cooperative, compliant and forthcoming, (R. at 634), and related well to the examiner. (R at 635.) As pointed out by the ALJ, these notes conflict with Spangler's assessment that Amaya could not or had an inadequate ability to relate to co-workers, to interact with supervisors, to maintain attention and concentration, to behave in an emotionally stable manner and to relate predictably in social situations.

The ALJ stated that he was giving significant weight to the opinion of consultative examiner Lanthorn and great weight to the state agency psychological consultants' opinions. (R. at 23.) Lanthorn diagnosed Amaya with bipolar disorder, most recent episode mixed, rule out panic disorder without agoraphobia; and rule

out personality disorder. (R. at 477.) He placed Amaya's then-current GAF score at 55-60, which placed her psychological symptoms in the moderate range. (R. at 477.) Lanthorn also stated that Amaya should have no difficulties learning simple tasks, but that more complicated tasks might present moderate or greater limitations. (R. at 478.) He stated that Amaya would have mild to moderate limitations interacting with others in the work setting and in dealing with changes and the requirements of the work setting. (R. at 478.) He stated that Amaya would have mild or slightly greater difficulties sustaining concentration and persisting at tasks. (R. at 478.)

State agency psychologist Leizer stated that Amaya's mental impairments resulted in no restrictions of activities of daily living, moderate difficulties in maintaining social functioning, mild difficulties in maintaining concentration, persistence or pace and no repeated episodes of decompensation of extended duration. (R. at 117.) Leizer further stated that it appeared that Amaya retained the mental capacity to perform all levels of nonstressful work. (R. at 118.) Leizer also completed a Mental Residual Functional Capacity Assessment, stating that Amaya had no understanding or memory limitations and no sustained concentration and persistence limitations. (R. at 121-22.) Leizer also said that Amaya was not significantly limited in her ability to ask simple questions, to request assistance, to get along with co-workers or peers without distracting them or exhibiting behavioral extremes or to maintain socially appropriate behavior and to adhere to basic standards of neatness and cleanliness. (R. at 121-22.) Leizer did say that Amaya was moderately limited in her ability to interact appropriately with the general public and to accept instructions and respond appropriately to criticism from supervisors. (R. at 121.)

State agency psychologist Milan stated that Amaya's mental impairments resulted in no restrictions of activities of daily living, moderate difficulties in maintaining social functioning, moderate difficulties in maintaining concentration, persistence or pace and no repeated episodes of decompensation of extended duration. (R. at 88-89.) Milan stated that Amaya was not significantly limited in her ability to remember locations and work-like procedures, to understand, remember and carry out very short and simple instructions, to sustain and ordinary routine without special supervision, to work in coordination with or in proximity to others without being distracted by them, to ask simple questions, to accept instructions and respond appropriately to criticism from supervisors, to get along with co-workers or peers without distracting them or exhibiting behavioral extremes or to maintain socially appropriate behavior and to adhere to basic standards of neatness and cleanliness. (R. at 90-91.) Milan stated that Amaya was moderately limited in her ability to understand, remember and carry out detailed instructions, to maintain attention and concentration for extended periods, to perform activities within a schedule, maintain regular attendance and be punctual within customary tolerances, to complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods and to interact appropriately with the general public. (R. at 90-91.) Milan stated that there was no evidence that Amaya's ability to make simple work-related decision was limited. (R. at 90.) Milan also stated that Amaya could understand and remember simple work instructions and work locations/procedures, concentrate and persist at simple work duties, completing tasks within a schedule and under ordinary supervision, interact appropriately with people and adapt to changing activities within the workplace and meet the basic demands of competitive work on a regular, ongoing basis, despite the limitations from her mental impairment. (R. at 90-91.)

Based on this evidence, I find that substantial evidence supports the weighing of the psychological evidence by the ALJ. That being so, I further find that substantial evidence supports the ALJ's finding as to Amaya's residual functional capacity and his finding that she was not disabled. An appropriate order and judgment will be entered.

ENTERED: September 16, 2014.

/s/ *Pamela Meade Sargent*
UNITED STATES MAGISTRATE JUDGE